UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ROBERT D. GENTRY,

                              NO. CIV. S-09-0671 LKK/GGH

       Plaintiff,

    v.

                                 O R D E R

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, and
Does 1-100,

       Defendants.

_____/

    Plaintiff brings an action for breach of the implied covenant of good faith and fair dealing and for breach of contract arising from defendant's handling of his underinsured motorist ("UIM") claim. Defendant moved for summary judgement on both claims.

## I. BACKGROUND

    Plaintiff was injured in an automobile accident on August 24, 2004, when another driver ran a red light at an intersection in Modesto, California. The police concluded that the other driver caused the accident. Decl. of Andre Snowden filed in support of Def.'s Mot. Summ. J. ("Snowden Decl.") Ex. 1. Plaintiff filed a UIM claim after sustaining knee injuries in an automobile accident. His insurance policy provided a limit of $100,000 for UIM coverage,

1 minus the amount covered by the other driver's insurance.

2 Plaintiff's claim was settled more than four years after the date

3 of the accident.

**A.  Knee Injury**

5 Plaintiff reported knee pain at the scene. On September 7,

6 2004, plaintiff sought treatment at Sutter Gold Medical Foundation

7 for bi-lateral knee pain. Plaintiff informed the physician that his

8 knees hit the dashboard in the accident. Decl. of Mathew Jaime

9 filed in support of Def.'s Mot. Summ. J. ("Jaime Decl.") Ex. 1. The

10 physician's report noted that internal derangement was suspected.

11 Id. On September 23, 2004, plaintiff consulted with an orthopedic

12 surgeon due to continuing pain in his knees. Id. Ex. 2.[1] A

13 subsequent MRI of the left knee revealed changes to the horn and

14 body of the lateral meniscus.[2] Id.

15 Dr. Robert Cash ("Dr. Cash") performed a left knee arthroscopy

16 on December 22, 2005. Dr. Cash testified that the surgery would

17 likely have not been required if plaintiff's knee had not been

18 injured in the accident. Dep. of Dr. Cash 31-32. Defendant's

19 medical examiner, Dr. Peter Salamon ("Dr. Salamon"), concurred that

20 the torn meniscus and the resulting surgery was related to the

21 accident. Dep. of Dr. Salamon 18.

22 _____

23 [1] The exhibit contains the report for the right knee. However, because the material facts related to the left knee MRI are

24 undisputed (Pl.'s Statement of Undisputed Facts, 42), the court accepts them as true and incorporates them herein.

25 [2] Prior to the accident, plaintiff had undergone arthroscopic surgery on the left knee in January 2003, and for the right one in

26 March 2000.

1      **B.    Defendant's Processing of the UIM Claim**

2            **1.    Plaintiff Submits UIM Claim**

3      On November 16, 2006, plaintiff settled his claim with the

4  adverse driver's insurer for $25,000, the policy limit,. On

5  December 23, 2006, plaintiff's counsel made a formal demand to

6  defendant for UIM benefits of $75,000 for medical expenses and

7  loss of wages, and a $5,000 waiver of medical payment

8  reimbursement. Plaintiff's counsel estimated the value of the

9  claim to be in excess of $105,000, but was willing to settle for

10 a total of $80,000. Snowden Decl. Ex. 4. The letter also

11 identified medical specials totaling $27,476.50. Id.

12      On December 28, 2006, defendant asked plaintiff's counsel for

13 medical documentation and proof of the USAA settlement. Id. Ex. 5.

14 On January 30, 2007, defendant sent a second letter essentially

15 making the same request. Id. Ex. 6. On February 5, 2007, defendant

16 received plaintiff's medical records and a renewed policy limit

17 demand (the second demand) from plaintiff's counsel.[3] Id. Ex. 7.

18 Snowden began processing the claim.

19            **2.    Snowden Evaluation and First Offer**

20      On February 6, 2007, Snowden, the claims adjuster, sent

21 plaintiff's counsel a letter requesting additional information

22

23

24 ───────────────

25      [3] Plaintiff asserts that this second policy demand again
   advised defendant of the medical specials totaling $27,476.50.
26 Pl.'s Sur-Reply at 3. However, an authenticated copy of the letter
   was not provided by either party.

3

1  regarding the loss of income claim.[4] Snowden then evaluated the

2  claim and concluded the medical specials totaled $5,301.58,

3  despite the January 31, 2007 letter from plaintiff's counsel

4  identifying over $27,000 in medical specials. Id. Ex. 9.

5  Plaintiff's expert testified that the medical specials were

6  improperly reduced. Peterson Decl. filed in support Opp'n

7  ("Peterson Decl.") ¶ 17 (D)(3).

8      On February 28, 2007, defendant offered plaintiff $4,886.12

9  based on Snowden's evaluation of the claim. Snowden Decl. Ex. 11.

10 Plaintiff's expert opined that this offer was a "low-ball offer"

11 in violation of Insurance Code § 790.03(h)(13) because it failed

12 to provide a reasonable explanation of the basis in the policy for

13 the offer in relation to facts or applicable law. Id. (D)(3)(I)

14 (14:6-14). Plaintiff's counsel rejected this offer on March 8,

15 2007, reiterating his settlement demand. Snowden Decl. Ex. 12.

16 Plaintiff's counsel also requested the matter be forwarded to

17 defense counsel so it could proceed to arbitration. Id. The State

18 Farm Claims File indicates that on March 12, 2007, defendant

19 established a funding reserve in the amount of $7,886.12 and the

20 matter was referred to counsel. Swingle Decl. filed in support of

21 Sur-Reply ("Swingle Sur-Reply Decl.") Ex. C CF 0102.

22 ////

23

---

24     [4] Defendant's Reply asserts that it was only from the January
   31, 2007 demand letter it learned about a loss of income claim.
25 However, the December 23, 2006 demand letter states "[i]n addition
   to his medical expenses, Mr. Gentry has a wage loss claim." Snowden
26 Decl. Ex. 4.

4

1      **C.   Defendant Retains Counsel**

2      On March 2007, defendant retained counsel, Matthew Jaime

3 ("Jaime"), who then began discovery. Jaime Decl. ¶ 5.

4         **1.   Jaime Initial Evaluation and Payment**

5      On July 31, 2007, Jaime prepared his initial evaluation of

6 plaintiff's claim after reviewing medical records, interrogatories,

7 and depositions. Id. ¶ 23, Ex. 7. On August 9, 2007, defendant

8 issued payment to plaintiff in the amount of $4,886.12. Snowden

9 Decl. Ex. 14. This amount was exactly the same amount determined

10 by Snowden despite the fact that Snowden's evaluation was conducted

11 without the benefit of medical records and other supporting

12 documentation. The August 9, 2007 letter failed to clarify the

13 medical payment reimbursement. On September 13, 2007, defendant's

14 employee, Miguel Diaz, noted in the claim file that the medical

15 payment claim was concluded and reimbursement was waived. Swingle

16 Sur-Reply Decl. Ex. B CF 0096. Defendant provided no evidence that

17 the reimbursement waiver information was communicated to plaintiff.

18         **2.   Independent Medical Examination**

19      On January 22, 2008, more than one year after plaintiff's

20 counsel identified over $27,000 in medical specials, Dr. Salamon

21 conducted a medical examination of plaintiff. The first report

22 concluded that the accident resulted in a tear of plaintiff's

23 meniscus, but that some of plaintiff's symptoms "need to be

24 apportioned to the degenerative change already present in his left

25 knee." Jaime Decl. Ex. 19. Two subsequent reports were issued in

26 response to queries from Jaime. The final one dated February 21,

1   2008, asserted that plaintiff's change in occupation was unrelated

2   to the accident. On February 26, 2008, Dr. Salamon's deposition was

3   taken. He testified that plaintiff's torn meniscus and need for

4   surgery was the result of the accident and that there was no

5   evidence in the medical records prior to the accident that

6   plaintiff was unable to work in his business because of knee pain.

7   Swingle Decl. Ex. C (Salamon Dep.).

8                    **3.   Evaluation Loss of Wages**

9        On June 16, 2008, Jaime provided his re-evaluation of

10  plaintiff's wage loss claims. Jaime Decl. Ex. 25. Jaime estimated

11  that the loss of wages had a value of $3,500. Id. Jaime concluded

12  that plaintiff's decision to close the landscaping business was

13  unrelated to the accident. Id. Therefore, he determined the only

14  loss of wages was during the approximately one month recovery

15  period from the left knee arthroscopy. Id.

16  **D. Arbitration**

17       On August 16, 2007, Jaime proposed to plaintiff's counsel that

18  the UIM claim be submitted to mediation. Van Egmond Decl. in

19  support of Sur-Reply ("Van Egmond Decl.") Ex. A. On September 17,

20  2007, plaintiff's counsel declined the offer of mediation. Id. Ex.

21  B. On September 19, 2007, plaintiff's counsel filed an order

22  compelling arbitration. Jaime Decl. Ex. 8. On September 26, 2007,

23  defendant agreed to set the matter for arbitration, over six months

24  after plaintiff's initial demand for arbitration was made. Id. Ex.

25  9.

26       On November 5, 2007, plaintiff's counsel for a third time

6

1    offered to settle for $75,000 in new money and a $5,000 medical
2    payment reimbursement waiver. Id. Ex. 12. On November 7, 2007,
3    plaintiff served a Cal. Code Civ. P. § 998 offer in these amounts
4    upon defendant. Id. Ex. 13.

5        On January 2, 2008 an arbitrator was selected. Id. Ex. 16. On
6    January 16, 2008, the hearing date was confirmed by plaintiff's
7    counsel for March 19, 2008. Id. Ex. 18. The arbitration was
8    rescheduled to September 10, 2008. Id. Ex. 27.

9                    **1.   Report and Increased Offer**

10       On July 16, 2008, Jaime issued a pre-arbitration report. The
11   report incorporated a range of $3,500 to $7,000 for lost wages. Id.
12   Ex. 26. Further, it reduced the medical specials from $24,892
13   claimed by plaintiff to $7,555, without any explanation other than
14   "adjustments."[5] Id. On August 8, 2008, defendant increased its
15   offer to plaintiff to $12,500 in new money, without explanation as
16   to the increased figure. Id. ¶ 50. Plaintiff's expert opined that
17   the August 8, 2008 letter violated Insurance Code § 790(h)(13)
18   because it failed to provide facts regarding how the settlement
19   figures were determined. Id. 14(g)-(h) (20:9-20).

20                           **2.   Decision**

21       On September 10, 2008, the matter was arbitrated. A decision
22   was issued on September 22, 2008. Plaintiff was awarded a total of
23   $101,794.44. Jaime Decl. Ex. 27. After crediting the $25,000 USAA

24   _____

25       [5] Plaintiff claims $27,476.50 in medical specials in its
     December 23, 2006 letter. Jaime's uses a total $24,892 in his
26   reports. The discrepancy is not explained by either party.

1 settlement and $3,014 medical payment, plaintiff was awarded
2 $73,690.44. Id. On October 1, 2008, defendant filed a motion to
3 have the award reduced to $7,880.41 arguing that plaintiff was
4 entitled to the amount paid by plaintiff's health insurer, not the
5 amount billed. Id. Ex. 28. Plaintiff objected and noted his concern
6 that the motion "is another way to delay the payment of the amount
7 owed." Id. Ex. 30. The motion was denied. Id. Ex. 31. On October
8 22, 2008, defendant issued payment in the amount of the
9 arbitrator's award. Id. Ex. 32. A check for $585.51 was issued for
10 interest, in response to a third request from plaintiff's counsel.
11 Id. Ex. 33 and 34. More than four years had lapsed since the date
12 of the accident, August 27, 2004.

13 **II. STANDARD FOR A FED. R. CIV. P. 56 MOTION FOR SUMMARY**
14 **JUDGMENT**

15 Summary judgment is appropriate when there exists no
16 genuine issue as to any material fact. Such circumstances
17 entitle the moving party to judgment as a matter of law. Fed. R.
18 Civ. P. 56(c); see also Adickes v. S.H. Kress & Co., 398 U.S.
19 144, 157 (1970); Secor Ltd. v. Cetus Corp., 51 F.3d 848, 853
20 (9th Cir. 1995). Under summary judgment practice, the moving
21 party

22      always bears the initial responsibility of informing
     the district court of the basis for its motion, and
23      identifying those portions of "the pleadings,
     depositions, answers to interrogatories, and
24      admissions on file, together with the affidavits, if
     any," which it believes demonstrate the absence of a
25      genuine issue of material fact.

26 Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed.

8

1  R. Civ. P. 56(c)).

2       If the moving party meets its initial responsibility, the
3  burden then shifts to the opposing party to establish the
4  existence of a genuine issue of material fact. Matsushita Elec.
5  Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585-86 (1986);
6  see also First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S.
7  253, 288-89 (1968); Secor Ltd., 51 F.3d at 853. In doing so, the
8  opposing party may not rely upon the denials of its pleadings,
9  but must tender evidence of specific facts in the form of
10 affidavits and/or other admissible materials in support of its
11 contention that the dispute exists. Fed. R. Civ. P. 56(e); see
12 also First Nat'l Bank, 391 U.S. at 289. In evaluating the
13 evidence, the court draws all reasonable inferences from the
14 facts before it in favor of the opposing party. Matsushita, 475
15 U.S. at 587-88 (citing United States v. Diebold, Inc., 369 U.S.
16 654, 655 (1962) (per curiam)); County of Tuolumme v. Sonora
17 Cmty. Hosp., 236 F.3d 1148, 1154 (9th Cir. 2001). Nevertheless,
18 it is the opposing party's obligation to produce a factual
19 predicate as a basis for such inferences. See Richards v.
20 Nielsen Freight Lines, 810 F.2d 898, 902 (9th Cir. 1987). The
21 opposing party "must do more than simply show that there is some
22 metaphysical doubt as to the material facts . . . . Where the
23 record taken as a whole could not lead a rational trier of fact
24 to find for the nonmoving party, there is no 'genuine issue for
25 trial.'"  Matsushita, 475 U.S. at 586-87 (citations omitted).
26 ////

## III. ANALYSIS

**A. Breach of Implied Covenant of Good Faith and Fair Dealing.**

### 1. Summary of California Law on Insurance Bad Faith

Under California law, "insurance bad faith" refers to a breach of the implied covenant of good faith and fair dealing as that covenant applies to insurance policies. An insurer breaches this covenant when it acts unreasonably in discharging its obligations under the policy. Crisci v. Security Ins. Co. of New Haven, Conn., 66 Cal. 2d 425, 430 (1967). Although a claim for breach of the implied covenant of good faith and fair dealing generally sounds in contract, in the insurance context, such a claim also sounds in tort. Jonathan Neil & Assoc. v. Jones, 33 Cal. 4th 917, 932 (2004).

The elements of a claim for tortious insurance bad faith are that benefits due under the policy were withheld and that the withholding was unreasonable. Wilson v. 21st Century Ins. Co., 42 Cal. 4th 713, 720 (2007). Even where benefits are ultimately found to be due, a withholding was reasonable, and therefore not in bad faith, if the insurer conducted a "thorough and fair" investigation, after which there remained a "genuine dispute" as to coverage liability. Id. at 720, 723 (quoting Chateau Chamberay Homeowners Ass'n v. Associated Internat. Ins. Co., 90 Cal. App. 4th 335, 347 (2001)); see also Guebara v. Allstate Insurance Company, 237 F.3d 987, 996 (9th Cir. 1999) (applying California law)).

1    Thus an insurer is not obligated to pay every claim made by
2  an insured. However, it cannot deny the claim "without fully
3  investigating the grounds for its denial." Wilson at 720-21
4  (quoting Frommoethelydo v. Fire Ins. Exchange, 42 Cal. 3d 208,
5  215 (1986)). An insurer cannot just focus on facts that support
6  its position. Further, delayed payment because of "inadequate or
7  tardy investigations" and "oppressive conduct by claims
8  adjusters seeking to reduce the amounts legitimately payable"
9  may also breach the implied covenant. Brehm v. 21st Century
10 Insurance Co., 166 Cal. App. 4th 1225, 1236 (2008) (quoting
11 Waller v. Truck Ins. Exchange, Inc., 11 Cal. 4th 1, 36 (1995)).
12    Generally, an insurer who denies or delays payment of
13 policy benefits where there is a genuine dispute as to the
14 existence or amount of coverage will not be liable for bad faith
15 if there is a genuine  dispute  concern the facts or the
16 interpretation of the policy. Wilson, 42 Cal. 4th at 723.
17 However, the genuine dispute rule "does not relieve an insurer
18 from its obligation to thoroughly and fairly investigate,
19 process and evaluate the insured's claim. A *genuine* dispute
20 exists only where the insurer's position is maintained in good
21 faith and on reasonable grounds." Id. (emphasis in original).
22 The questions of whether an investigation was reasonable and
23 whether a genuine dispute existed are ordinarily questions for
24 the trier of fact. Id. at 724, Hangarter v. Provident Life &
25 Accident Ins. Co., 373 F.3d 998, 1010 (9th Cir. 2004) (citing
26 Amadeo v. Principal Mut. Life Ins. Co., 290 F.3d 1152, 1161 (9th

Cir. 2002)).

**2.   Whether State Farm Conducted a Thorough Investigation and Fair Evaluation of Plaintiff's Claim.**

Defendant argues that its handling of plaintiff's claim was reasonable as a matter of law and that the conduct complained of by plaintiff does not "reach the level of an unreasonable withholding of policy benefits which is required to prevail in an insurance bad faith claim." Def.'s Mem. of P. & A. 17. Defendant contends that it investigated the claim and retained and relied on qualified experts in denying plaintiff's claim. As noted, an insurer has a duty to fully and timely investigate, evaluate and process claims. Wilson, 42 Cal. 4th at 720-23. To survive a motion for summary judgement on a bad faith claim, plaintiff must present evidence of material issues of fact as to the reasonableness of defendant's handling of the claim.

Plaintiff argues that defendant failed to properly investigate plaintiff's claims and was unreasonably dilatory in its investigations. Sur-Reply at 11. Specifically, defendant failed to (1) obtain plaintiff's medical records to evaluate his claim; (2) advise plaintiff of the "Make Whole Rule;"[6] (3) respond to multiple policy limit demands; (4) advise plaintiff of the amount defendant could recover on its medical

_____

[6] Under this rule, the insured must be "made whole" before the insurer may enforce its reimbursement claim for medical expenses paid on insured's behalf. See Progressive West Ins. Co. v. Yolo County Super. Ct., 135 Cal. App. 4th 263, 273 (2005).

1   reimbursement claim; (5) promptly obtain medical and wage

2   records; and (6) have plaintiff submit to an IME.

3        Plaintiff presented evidence that he made policy limit

4   demands on December 23, 2006 and on January 31, 2007. However,

5   medical records were not obtained by defendant until the matter

6   was referred to Jaime in March 2007. This was so despite

7   plaintiff's request for reimbursement of medical specials that

8   exceeded $27,000. These facts could lead a reasonable jury to

9   find that defendant's unreasonably delayed in obtaining

10  plaintiff's medical records.

11       With respect to defendant's loss of income investigation,

12  defendant responds that it first learned that plaintiff was

13  bringing such a claim on February 5, 2007, when it received

14  plaintiff's January 31, 2007 demand. However, plaintiff's

15  December 23, 2006 demand letter also included a claim for wage

16  losses. In the letter, plaintiff's counsel communicated a belief

17  that plaintiff's case had a value of over $105,000. Based on the

18  magnitude of the claim relative to policy limits, a medical

19  evaluation could reasonably be determined as warranted at that

20  time. Yet defendant waited until February 6, 2007 to begin an

21  investigation. Moreover, defendant's medical exam of plaintiff

22  occurred on January 22, 2008, more than one year after defendant

23  was notified of the wage loss claim. A reasonable jury could

24  find this investigation into the medical claims and extent of

25  plaintiff's injury to constitute an unreasonable delay.

26       Plaintiff also argues that defendant did not timely obtain

13

1   counsel's opinion on the settlement. Plaintiff presented

2   evidence that the defendant's first offer was made without the

3   advice of counsel, particularly as that advice related to the

4   amount of medical specials. Further, plaintiff contends that the

5   medical specials were improperly reduced by Jaime in his pre-

6   arbitration report.[7] The court has reviewed Jaime's report and

7   there is no explanation as to why the medical specials were

8   reduced from the amount plaintiff claimed. The reduction in the

9   medical specials substantially reduced the settlement offers

10  made by defendant.

11      In Wilson, the California Supreme Court found similar

12  conduct by an insurer to preclude summary judgment. 42 Cal. 4th

13  at 721-22. Specifically, the court held that "a jury could find

14  that nothing in the material the claims examiner had received

15  justified [his] conclusions. [The insurer] directs us to no

16  medical report or opinion on the basis of which the claims

17  examiner could reasonably have ignored or disbelieved." Id. at

18  721. The court continued that an insurer could not, "consistent

19  with the implied covenant of good faith and fair dealing[,

20  ignore plaintiff's physician's] conclusions without any attempt

21  at adequate investigation, and reach contrary conclusions

22  lacking any discernable medical foundation." Id. at 722

23  (citations omitted). Here too a reasonable jury could find this

24

25      [7] The arbitrator decision concluded there is no published
    authority finding that contractual discounts provided by health-
26  provider contracts are "anything other than a collateral source
    benefit." Matthew Decl. Ex. 31.

1   conduct to be unreasonable.

2        Plaintiff also asserts that the insurer is liable in tort

3   if it fails to accept a reasonable settlement offer. However, it

4   is "well established that an insurer's tort liability for

5   failure to accept a reasonable settlement offer can arise only

6   with respect to third party, or liability, coverage."

7   Rappaport-Scott v. Interinsurance Exchange of the Automobile

8   Club, 146 Cal. App. 4th 831, 836 (2007). Thus, defendant's

9   failure to accept the multiple policy demands does not give rise

10  to a claim.[8]

11       In sum, defendant's motion is denied as to the

12  reasonableness of its investigation and evaluation of

13  plaintiff's claim.

14            **3.   Whether there was a "Genuine Dispute" as to the
                     Value of Gentry's UIM Claim**

15

16       Defendant also argues that it is entitled to summary

17  judgment on plaintiff's bad faith claim because there is

18  evidence of a "genuine dispute" regarding the value and

19

20

21  ────────────

22       [8] Plaintiff cites to the defendant's Claim Service Record
    (Swingle Sur-Reply Decl. Ex. B) as evidence that it failed to
23  respond to plaintiff's repeated requests for a waiver of the $5,000
    medical payment reimbursement. As best the court can discern,
    however, the activity log  does not demonstrate requests which were
24  ignored. Given that the court finds that a reasonable jury could
    determine that State Farms's conduct was unreasonable without
25  proving that defendant failed to respond to these alleged repeated
    requests, the court need not address the sufficiency of plaintiff's
26  evidence as to this argument.

1    causation of plaintiff's claimed injuries.[9] The genuine dispute

2    rule allows for summary judgement "where the summary judgment

3    record demonstrates the absence of triable issues as to whether

4    the disputed position upon which the insurer denied the claim

5    was reached reasonably and in good faith." <u>Wilson</u>, 42 Cal. 4th

6    at 724.

7         <u>Wilson</u> declined to grant summary judgment for the insurer

8    under the genuine dispute doctrine with facts very similar to

9    the case at bar. <u>Id.</u> at 724-26. Specifically, in <u>Wilson</u>, the

10   insurer paid the full policy limits on the plaintiff's UIM

11   claim. Nonetheless, the court reasoned that a reasonable jury

12   could find for plaintiff because there was evidence of the

13   insurer's initial denial of benefits and resulting two-year

14   delay in receipt of benefits. <u>Id.</u> The standard set forth in

15   <u>Wilson</u> was applied by the California Court of Appeals in <u>Brehm</u>

16   <u>v. 21st Century Ins. Co.</u>, 166 Cal. App. 4th 1224, 1239 (2008),

17   where, unlike in <u>Wilson</u>, the insurer had plaintiff examined by a

18   physician. The court reasoned that plaintiff had stated a claim

19   despite this fact because he alleged that the examination was a

20   sham. <u>Id.</u> Defendant contends that here, where there is no

21

---

22        [9] Defendant specifically argues there was a genuine dispute
     as to the nature and scope of plaintiff's injury, highlighted by
23   the evidence that the arbitrator's award were "more closely
     aligned" with defendant's evaluation. Def.'s Mem. of P. & A. at 21.
24   Such a conclusion, however, depends on how plaintiff's offers
     should be characterized. A reasonable jury could characterize these
25   offers in the manner described above. As such, defendant cannot
     succeed as a matter of law on this theory.
26

1  evidence of a sham, <u>Brehm</u> should be distinguished. The court

2  cannot agree. Rather, the California Supreme Court explicitly

3  explained that, "An insurer's good or bad faith must be

4  evaluated in light of the totality of the circumstances

5  surrounding its actions." <u>Wilson</u>, 42 Cal. 4th at 723.

6      The facts described above could demonstrate to a reasonable

7  jury that defendant acted unreasonably. This is especially so

8  given that Dr. Salamon concurred with Dr. Cash, plaintiff's

9  treating physician, as to the cause of plaintiff's injury.

10 Further, with respect to the arbitrator's award, plaintiff was

11 awarded $73,690.44 in new money as compared to the $75,000

12 policy limit demand, and the defendant's highest settlement

13 offer was $12,500 in new money.

14     The court in <u>Wilson</u> affirmed that the genuine dispute rule

15 does not alter the standard for summary judgment, "[n]or does

16 the rule alter the standards for deciding and reviewing motions

17 for summary judgment." <u>Wilson</u> at 724. Based on the evidence

18 presented relative to the medical injury and arbitrator award,

19 viewed in the light most favorable to the non-moving party, the

20 court finds that a jury could conclude that there was no genuine

21 dispute. Further, as discussed above, there are issues of

22 triable fact as to whether defendant acted reasonably and in

23 good faith with respect to plaintiff's insurance claim.

24 Accordingly, defendant is not shielded from bad faith liability

25 based on the genuine dispute rule at this stage in the

26 litigation. Thus, the motion for summary judgment on the basis

17

1 of a genuine dispute is denied.

2          **4.  Whether State Farm Reasonably Relied on the**
              **Advice of Independent Legal Counsel.**

3

4      Defendant asserts that it acted reasonably and with proper

5 cause for its actions because it relied in good faith on advice

6 of its legal counsel, Jaime.[10] Reply at 7. Advice of counsel

7 serves as a defense where insurer reasonably relied on such

8 advice, even if ultimately the attorney's judgment was mistaken.

9 State Farm Mut. Auto. Ins. Co. v. Super. Ct., 228 Cal. App. 3d

10 721 (1991). Defendant relies on State Farm to conclude that it

11 is entitled to judgment because it relied on advice from

12 counsel. State Farm, however, merely held that, "An insurer may

13 defend itself against allegations of bad faith and malice in

14 claims handling with evidence the insurer relied on the advice

15 of competent counsel." Id. at 725. This case did not hold that

16 if an insurer relied on counsel that it cannot be liable for

17 insurance bad faith. Rather the question is whether such

18 reliance was reasonable. Accordingly, it is just one piece of

19 evidence that a jury can consider when determining whether the

20 insurer acted reasonably.

21      Moreover, plaintiff has presented evidence from which a

22 _____

23      [10] Defendant also argues that reliance on the defendant's
medical exam "precludes bad faith liability". Def.'s Mem. of P. &
24 A. at 22. Assuming a jury would find such reliance, defendant
provides no case law in support of the contention that bad faith
25 liability is precluded because defendant relied on its paid expert.
This is not to say, however, that a jury could not weigh this
26 evidence when determining whether defendant's conduct was in bad
faith.

1   reasonable jury could also find that it was not reasonable for

2   defendant to rely on the advice of its counsel. This evidence

3   includes Jaime's unexplained reduction of the medical specials

4   claimed by plaintiff. Plaintiff's expert testified that a

5   reasonable insurer would have asked Jaime to explain the

6   reduction because it violated the collateral source rule.[11] Jaime

7   used the lowered medical specials ($7,880 versus nearly $24,892

8   claimed by plaintiff), to arrive at an estimated jury award of

9   $30,000 to $45,000 (less USAA settlement and advance). Given the

10  significant difference in the figures and plaintiff's repeated

11  statements as to the value of the medical specials, a trier of

12  fact could view defendant's reliance on Jaime's unexplained

13  opinion to be unreasonable. Thus, defendant is likewise not

14  entitled to summary judgment on plaintiff's bad faith claim

15  because of this defense.

16      **B.   Breach of Contract**

17      Defendant moves for summary judgment on plaintiff's breach

18  of contract claim. Under California law, a claim for breach of

19  contract includes four elements: that a contract exists between

20  the parties, that the plaintiff performed his contractual duties

21  or was excused from nonperformance, that the defendant breached

22

23      [11]  Under this rule, "if an injured party receives some
    compensation for his injuries from a source wholly independent of
24  the tortfeasor, such payment should not be deducted from the
    damages which the plaintiff would otherwise collect from the
25  tortfeasor." Olsen v. Reid, 164 Cal. App. 4th 200, 205 (2008)
    (Moore, J. concurring) (quoting (Helfend v. Southern Cal. Rapid
26  Transit Dist., 2 Cal. 3d 1, 6, (1970)).

1  those contractual duties, and that plaintiff's damages were a

2  result of the breach. <u>Reichert v. General Ins. Co.</u>, 68 Cal. 2d

3  822, 830 (1968); <u>First Commercial Mortgage Co. v. Reece</u>, 89 Cal.

4  App. 4th 731, 745 (2001). Further, unreasonable delay in paying

5  policy benefits due "is an actionable withholding of benefits

6  which may constitute a breach of contract as well as bad faith

7  giving rise to damages in tort." <u>Intergulf Dev. LLC v. Super.

8  Ct.</u>, 83 Cal. App. 4th 16, 20 (2010); <u>see also</u> <u>Kotler v.

9  PacifiCare of California</u>, 126 Cal. App. 4th 950, 956 (2005)

10  (finding a triable fact as to whether defendant's delay in

11  providing benefits to plaintiff constituted a breach of contract

12  because the delay was unreasonable); <u>Schwartz v. State Farm &

13  Casualty Co.</u>, 88 Cal. App. 4th 1329, 1339 (2001) ("It is well

14  established that a breach of the implied covenant of good faith

15  is a breach of the contract . . . , and that a breach of a

16  specific provision of the contract is not a necessary

17  prerequisite to a claim for breach of the implied covenant of

18  food faith and fair dealing.") (internal citations omitted).[12]

19  Finally, the state legislature has codified the requirement that

20  contracts must be performed at the time specified or within a

21  "reasonable time." Cal. Civ. Code § 1657.

22  _____

23  [12] Defendant relies upon <u>Paulson v. State Farm Mut. Auto. Ins.
   Co.</u>, 867 F. Supp. 911, 917-18 (C.D. Cal. 1994) (J. Letts), in its

24  motion for summary judgment. There the district court expressed
   policy reasons for his opposition to the "tortification of contract

25  law," 867 F. Supp at 913-14. These concerns are irrelevant to this
   court's resolution of defendants motion - the court must follow the

26  law as set forth by the California Supreme Court regardless of the
   court's opinion as to the merits of that law.

1    Plaintiff argues that defendant engaged in the following

2 conduct:

3        multiple acts which constitute a breach of its
         insurance contract including (a) failing to reasonably
4        make a good faith offer of the benefit payments owed
         to Gentry pursuant to the insurance contract; (b)
5        delaying payments lawfully owed to Gentry under the
         insurance policy; (c) failing to reasonably, promptly
6        and completely investigate Gentry's claim under the
         insurance contract; (d) and failing to make a good
7        faith effort to obtain prompt, fair and equitable
         settlement of Gentry's claims for the benefit owed to
8        Gentry under the insurance contract.

9
Sur-Reply at 9.
10
     Plaintiff's breach of contract claim is essentially based
11
upon defendant's breach of the implied covenant of good faith
12
and fair dealing and upon defendant's unreasonable delay in
13
providing plaintiff with benefits under his insurance contract.
14
Breach of the implied covenant is a breach of contract.
15
Schwartz, 88 Cal. App. 4th at 1339. An unreasonable delay in
16
payment of benefits owed under a contract can support a claim
17
for a breach of contract. Intergulf Dev. LLC, 83 Cal. App. 4th
18
at 20. Plaintiff has presented evidence that a reasonable jury
19
could find that (1) defendant acted in bad faith and (2)
20
defendant unreasonably delayed in making payment under the
21
policy by not conducting a timely investigation of the claim and
22
delaying arbitration and settlement of the claim. Because there
23
are triable questions of fact as to these issues, defendant's
24
motion for summary judgement on plaintiff's breach of contract
25
claim is denied.
26

21

1          **C.    Punitive Damages**

2          Defendant argues that plaintiff failed to produce any

3    evidence in support of his claim for punitive damages and, thus,

4    it is entitled to summary judgment on whether punitive damages

5    may be awarded. The standard for punitive damages is statutory.

6    The California Civil Code provides that the plaintiff has to

7    prove "by clear and convincing evidence that the defendant has

8    been guilty of oppression, fraud, or malice." Civ. Code § 3294.

9    (1) "Malice" means conduct which is intended by the defendant to

10   cause injury to the plaintiff or despicable conduct which is

11   carried on by the defendant with a willful and conscious

12   disregard of the rights or safety of others. (2) "Oppression"

13   means despicable conduct that subjects a person to cruel and

14   unjust hardship in conscious disregard of that person's rights.

15   (3) "Fraud" means an intentional misrepresentation, deceit, or

16   concealment of a material fact known to the defendant with the

17   intention on the part of the defendant of thereby depriving a

18   person of property or legal rights or otherwise causing injury.

19   Id.

20          Plaintiff asserts that defendant's conduct amounts to a

21   "conscious disregard" for plaintiff's rights because defendant

22   "unreasonably delay[ed] the investigation," creating an

23   investigation "'not fair' to plaintiff," and failed to accord

24   plaintiff "interest at least equal weight to its own." Sur-Reply

25   at 13. While a jury might conclude that plaintiff failed to make

26   a case for punitive damages the court cannot say that a

1   reasonable jury could not find there was a conscious disregard

2   of plaintiff's right to have his UIM claim resolved in a timely

3   manner.

4        First, plaintiff provided evidence that defendant waited

5   over six months to agree to arbitration, and evidence that

6   defendant delayed the arbitration. The request to proceed to

7   arbitration was made on March 8, 2007, and the matter was

8   finally arbitrated on September 10, 2008, more than one and one-

9   half years after the initial request was made. Other events that

10  a jury could determine constituted a conscious disregard include

11  the timeliness of the medical and wage loss investigation and

12  the defendant's medical examination. Thus, defendant's motion

13  for summary judgement on plaintiff's demand for punitive damage

14  claim is denied.

15                        **IV. CONCLUSION**

16       For the foregoing reasons, defendant's motion for summary

17  judgment, ECF No. 31, is DENIED in its entirety.

18       IT IS SO ORDERED.

19       DATED:  July 26, 2010.

20

21

22                         LAWRENCE K. KARLTON
                           SENIOR JUDGE
23                         UNITED STATES DISTRICT COURT

24

25

26

                               23